[Cite as *Porter v. Hammond N. Condominium Assn.*, 2025-Ohio-2210.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| DIANA PORTER, | : | APPEAL Nos. | C-240571 |
| | | | C-240572 |
| KATHLEEN M. BENNETT, | : | TRIAL Nos. | A-2401841 |
| | | | A-2402299 |
| WILLIAM FRANKENSTEIN, | : | | A-2402872 |
| AUDREY WOODS, | : | | |
| and | : | JUDGMENT ENTRY | |
| JOAN BERRY, | : | | |
| Plaintiffs-Appellants, | : | | |
| and | : | | |
| PATTI GRIFFITH, | : | | |
| Plaintiff, | : | | |
| vs. | : | | |
| HAMMOND NORTH CONDOMINIUM ASSOCIATION, | : | | |
| | : | | |
| Defendant/Plaintiff/Third-Party Plaintiff-Appellee, | : | | |
| and | : | | |
| VANESSA W. DENIER, | : | | |
| JAN WELSH, | : | | |
| BARB GLOECKNER, | : | | |
| CAREN THEURING, | : | | |
| JOAN PIRONE, | : | | |
| JOHN MORAWETZ, | : | | |

and

GEORGE ALEXANDER,

    Defendants-Appellees,

    and

HUNT BUILDERS CORPORATION,

    Defendant,

  vs.

LEONARD WEBB,

    and

BRENDA I. WOODS,

    Third-Party Defendants-
    Appellants,

    and

ADRIENNE D. MOORE-CORNWELL,

    Defendant/Third-Party Plaintiff-
    Appellant,

    and

HUNTINGTON NATIONAL BANK, et al.,

    Defendants.

 

    This cause was heard upon the appeals, the record, the briefs, and arguments.

    For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

    Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

    The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial

court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 6/25/2025 per order of the court.**


**By:**_____
          **Administrative Judge**

[Cite as *Porter v. Hammond N. Condominium Assn.*, 2025-Ohio-2210.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DIANA PORTER, | : | APPEAL NOS. C-240571 |
| | | C-240572 |
| KATHLEEN M. BENNETT, | : | TRIAL NOS. A-2401841 |
| | | A-2402299 |
| WILLIAM FRANKENSTEIN, | : | A-2402872 |
| AUDREY WOODS, | : | |
| and | : | *O P I N I O N* |
| JOAN BERRY, | : | |
| Plaintiffs-Appellants, | : | |
| and | : | |
| PATTI GRIFFITH, | : | |
| Plaintiff, | : | |
| vs. | : | |
| HAMMOND NORTH CONDOMINIUM ASSOCIATION, | : | |
| | : | |
| Defendant/Plaintiff/Third-Party Plaintiff-Appellee, | : | |
| and | : | |
| VANESSA W. DENIER, | : | |
| JAN WELSH, | : | |
| BARB GLOECKNER, | : | |
| CAREN THEURING, | : | |
| JOAN PIRONE, | : | |
| JOHN MORAWETZ, | : | |

and

GEORGE ALEXANDER,

    Defendants-Appellees,

    and

HUNT BUILDERS CORPORATION,

    Defendant,

  vs.

LEONARD WEBB,

    and

BRENDA I. WOODS,

    Third-Party Defendants-
    Appellants,

    and

ADRIENNE D. MOORE-CORNWELL,

    Defendant/Third-Party Plaintiff-
    Appellant,

    and

HUNTINGTON NATIONAL BANK, et al.,

    Defendants.

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: June 25, 2025

*Lundrigan Law Group Co., L.P.A., W. Kelly Lundrigan* and *Nicole M. Lundrigan*, for Appellants,

*Reminger Co., L.P.A., Ian D. Mitchell* and *Brandon Franklin*, for Appellees Hammond North Condominium Association, Vanessa W. Denier, Jan Welsh, Barb Gloeckner, Caren Theuring, Joan Pirone, Joan Morawetz, and George Alexander.

**CROUSE, Judge.**

{¶1}   Appellants, a group of condominium unit owners, appeal the judgment entered by the Hamilton County Court of Common Pleas on their claims seeking injunctive relief and damages against their condominium association and its board of directors, who they allege breached the condominium's declaration and by-laws.

{¶2}   Appellants contend the trial court deprived them of their right to a jury trial under the Ohio Constitution by disposing of their damages claim and the factual issues underlying it after a bench trial. For the reasons set forth below, we agree. The Ohio Constitution preserved Appellants' right to a jury trial on their claims seeking damages for breach of the condominium's governing documents. The trial court's disposition of that claim following a bench trial on the equitable issues deprived them of that right. We therefore reverse the judgment of the trial court and remand the cause for a jury trial or other proceedings consistent with Appellants' constitutional rights.

## I. BACKGROUND

### A.

{¶3}   This case centers on the Hammond North Condominium ("the HNC"), a condominium property established under Ohio law and located in Cincinnati, Ohio. Appellants all own or possess condominium units in the HNC. Many of the rights of HNC unit owners are set forth in what we will call the "governing documents," which include the "Amended and Restated Declaration of Condominium and By-Laws for the Hammond North Condominium" ("the Declaration"), and the "Amended and Restated By-Laws of the Hammond North Condominium Association" ("the By-Laws"). Pursuant to the Declaration and Ohio law, unit owners in the HNC automatically become members of the Hammond North Condominium Association ("the Association"). The Association is governed by and acts through its board of directors

("the Board").

**{¶4}** Appellees include the Association and the members of the Board ("the Board Members").

**{¶5}** Because this case turns on the propriety of the factfinding at the bench trial, we do not draw on the trial record for the following narrative of events. Rather, we rely on the parties' operative pleadings, supplemented as necessary by their pre-trial proposed findings of fact.

**{¶6}** In February 2023, a fire caused substantial damage to the HNC including smoke damage. The extent and location of this damage is in dispute. While the fire itself was localized, the Association contends that the HNC's ventilation spread soot contamination throughout the building, leading to risks of mold and bacterial growth throughout the building that require remediation. Appellants contest this characterization.

**{¶7}** In response to the fire, the Board adopted a remediation and mitigation plan ("the Plan"). That Plan would require unit owners, along with their furnishings, to move out of their homes for seven months or more, while contractors removed walls and ceilings in common areas and units. According to Appellees, this process will require asbestos abatement. This extensive work was required, in part, because the Plan calls for the installation of a new sprinkler system.

**{¶8}** Appellees contend that the proper and comprehensive remediation of the soot contamination and installation of the new sprinklers are essential to the Association's ability to secure future insurance. Appellants dispute the truth of these claims. The parties agree that the City of Cincinnati approved a version of the repairs required under the Plan that included the installation of the new sprinkler system. The parties seem to disagree, however, as to whether the sprinkler system was necessary

to secure that approval.

{**¶9**}  And then there's the money. The parties appear to agree that, prior to trial, the Association had not settled on how it would fund the repairs required by the Plan. Nor had the Board yet passed an annual budget for the Association that included any costs associated with the Plan. Appellees hoped to fund the Plan with insurance proceeds from the fire, but Appellants allege that the HNC's insurance policy would be insufficient to cover the cost. Appellants further argue that the insurance company will not cover the new sprinklers, as they would constitute "improvements," rather than "repairs." The balance of the price tag, Appellants allege, will have to be made up with special assessments imposed upon the unit owners.

{**¶10**}  To effectuate its Plan, the Board adopted a formal "Fire Prevention & Restoration Unit Entry Policy" ("the Policy"), which was attached to the complaint and the contents of which are not contested. The Policy requires unit owners to permit a construction manager to "inspect and assess" their units, subject to a notice requirement. It further requires the owners to vacate their units, along with all their personal property, within 30 calendar days of receiving notice, so that construction crews can "perform the mitigation, sprinkler installation, and reconstruction work." If a unit owner does not vacate their unit, "the Association will enter the unit" and charge the unit owner for the cost of any damage, as well as the cost to remove and store any personal property there found. The Policy forbids any unit owner to interfere with or delay the Plan, and reserves for the Board authority to enforce the Policy in any manner permitted under Ohio law and the governing documents.

{**¶11**}  Appellants refused to abide by requests to remove themselves from their

units, leading several of them to institute the proceedings now on appeal.[1]

**B.**

{¶12} Several of the appellant unit owners, with lead plaintiff, Diana Porter ("the Porter Plaintiffs"), filed suit in the case numbered A-2402299 in the Hamilton County Court of Common Pleas against Appellees (the Association and Board Members) and the Hunt Builders Corporation ("Hunt Builders"), a contractor engaged to work on repairs and renovations associated with the Plan. The Porter Plaintiffs sought damages, a declaration of their rights under the governing documents, and an injunction to prevent the Plan and Policy from moving forward. Appellees responded with counterclaims against the Porter Plaintiffs. Appellees also impleaded several other unit owners, bringing third-party claims for injunctive relief that would mandate their compliance with the Policy.

{¶13} The Association filed a separate complaint for foreclosure against another unit owner, appellant Adrienne D. Moore-Cornwell, in the case numbered A-2402872. Moore-Cornwell answered, bringing counterclaims against the Association and third-party claims against the Board Members.

{¶14} The trial court consolidated these proceedings, along with a third proceeding numbered A-2401841,[2] under the case numbered A-2402299, which had been initiated by the Porter Plaintiffs.

---

[1] Below, Appellants also alleged that Vanessa Denier, a member of the Board and an appellee in this court, was properly removed from the Board by a referendum vote of the unit owners, but that the Board had unlawfully refused to acquiesce in her removal. Because Appellants do not press this issue on appeal, we have omitted discussion of these allegations from this background section, along with the procedural history related solely to these claims.

[2] This third case was brought by another unit owner, Patti Griffith, who filed a pro se complaint against "the Hammond North Condominium Board" seeking an injunction based on allegations largely similar to the Porter Plaintiffs'. While Griffith's case was consolidated with the others below, Griffith was not included on either of Appellants' notices of appeal and did not file a notice of her own. She is therefore not an appellant in this court.

{¶15}  The Porter Plaintiffs' operative complaint lists seven numbered causes of action. The first of these causes of action, brought as a derivative claim on behalf of the Association, alleged (1) breach of fiduciary duty by the Board and its members. The next three causes of action, which named all Appellees, alleged respectively (2) "breach of contract and bad faith," (3) intentional infliction of emotional distress, and (4) intentional interference with contracts. The Porter Plaintiffs' remaining causes of action included claims against Hunt Builders, none of which are relevant to this appeal, and a civil-conspiracy claim against all defendants.

{¶16}  Under their second cause of action, the Porter Plaintiffs alleged that they "have and will continue to suffer damage as a proximate result" of the Association and Board Members' breach and bad faith, and therefore requested "remedies for declaratory relief, specific performance, and temporary, preliminary and permanent injunctive relief," in addition to damages.

{¶17}  Moore-Cornwell's amended answer and counterclaim, in which Moore-Cornwell also included a general jury demand, lists eight counterclaims, some of which overlap with the Porter Plaintiffs' causes of action and some of which do not. As relevant here, Moore-Cornwell's first three counterclaims are functionally identical to the Porter Plaintiffs' first three causes of action. Because Moore-Cornwell's second cause of action/counterclaim is the only relevant claim in this appeal, and because it is substantially identical to the Porter Plaintiffs' second claim, we will henceforth use the Porter Plaintiffs' second cause of action to refer to both claims collectively.

{¶18}  The Association and Board Members, as described above, responded with counterclaims, third-party claims, and claims in a fresh complaint. As relevant here, these claims brought by the Association and Board Members can be collapsed into their first counterclaim against the Porter Plaintiffs, which sought an injunction

to enforce the Policy and to require various owners to remove themselves and their personal property so that the Plan could move forward.

**{¶19}** The Porter Plaintiffs and Association each sought a temporary restraining order ("TRO") against the other, and both requests were denied. The Porter Plaintiffs also sought a preliminary injunction. After their TRO request was denied, however, the Porter Plaintiffs requested that the hearing on their preliminary injunction be consolidated with a trial on the merits. The trial court granted this consolidation request and scheduled a bench trial.

**{¶20}** The Porter Plaintiffs protested the decision to try the case to the bench, arguing that they had a constitutional right to a jury. After briefing on the issue, the trial court declined to impanel a jury, ruling that the only issues that would "proceed at the combined injunction trial" were "equitable issues" and "issues of law that require a declaration of the meaning of the governing documents." Such issues, the trial court reasoned, carried no right to a jury trial. The trial court further explained that "[a]ll claims for monetary damages will be set for trial at a later date to preserve each parties' right to a jury trial."

**{¶21}** When the bench trial began, Appellants reiterated their objections to proceeding without a jury, which the trial court overruled. The parties then tried their cases to the court over six days.

**{¶22}** Following the trial and submission of written closing arguments, the court issued an order captioned "Findings of Fact, Conclusions of Law, and Final Order." In it, the trial court entered judgment "in Favor of the Defendants' Counterclaim, Claim I, and against the Plaintiffs on their Second Cause of Action." The court further found that there was "no just reason for delay" and stated that its order constituted a final judgment under Civ.R. 54(B).

**{¶23}** Appellants then filed two timely notices of appeal. The notice of appeal filed in the case numbered A-2402299 produced the appeal numbered C-240571, while the notice filed in the case numbered A-2402872 produced the appeal numbered C-240572. This court consolidated the two appeals.

## II. APPELLATE JURISDICTION

**{¶24}** Before we address the merits, we begin by addressing our jurisdiction to hear this appeal. Although neither party has raised the issue, we are "obliged to consider our jurisdiction" and to police those jurisdictional boundaries. *Preterm-Cleveland v. Yost*, 2022-Ohio-4540, ¶ 9 (1st Dist.). The question of jurisdiction in this case arises because the trial court's judgment did not expressly resolve all pending claims in this litigation.

**{¶25}** Ohio's courts of appeals have jurisdiction "to review, affirm, modify, set aside, or reverse judgments or final orders" of inferior courts. R.C. 2501.02(C); *see also* Ohio Const., art. IV, § 3(B)(2). "Final order" is defined in R.C. 2505.02(B), which sets forth eight categories of such orders.

**{¶26}** In their jurisdictional statement, Appellants proffer two bases for our jurisdiction: R.C. 2505.02(B)(1) and (B)(4). We are doubtful that the entry below was a "final order" granting or denying a "provisional remedy" under R.C. 2505.02(B)(4). However, we do agree that we have jurisdiction pursuant to R.C. 2505.02 (B)(1), which defines "final order" to include "[a]n order that affects a substantial right in an action that in effect determines the action and prevents a judgment."

**{¶27}** We begin by noting that the word "action" in (B)(1) refers not to an entire lawsuit and all claims therein, but to a particular claim for relief or "cause of action." *See, e.g.*, *Noble v. Colwell*, 44 Ohio St.3d 92, 95 (1989) ("The words 'claim for relief,' as used in Civ. R. 54(B), are synonymous with 'cause of action.'" (Cleaned up.)).

13

This view of the text of R.C. 2505.02(B)(1) is based not only on the meaning of the term "action" at the time that provision's language was originally enacted,[3] but also on a half century of precedents that have permitted appeals from judgments resolving fewer than all outstanding causes of action under the Ohio Rules of Civil Procedure. *See, e.g., Alexander v. Buckeye Pipe Line Co.*, 49 Ohio St.2d 158, 159-160 (1977) (holding that appeal of judgment on discrete causes of action properly certified under Civ.R. 54(B) did not violate R.C. 2505.02(B)).

**{¶28}** A trial court's order "determine[s] the action and prevent[s] a judgment for the party appealing" only if it "dispose[s] of the whole merits of the cause or some separate and distinct branch thereof and leave[s] nothing for the determination of the court." (Cleaned up.) *State ex rel. Sands v. Culotta*, 2021-Ohio-1137, ¶ 8. Thus, a valid, final, and binding judgment as to even a *single* claim for relief is a final order under R.C. 2505.02(B)(1), because it "determines" that particular "action" and "prevents a judgment" for the losing party with respect to it. *See Smith v. Platinum Property Mgt.*, 2024-Ohio-5687, ¶ 5 (1st Dist.) ("Trial courts 'dispose of' claims through their judgment entries.").

**{¶29}** But not every order purporting to adjudicate claims is a final judgment. Under Civ.R. 54(B), a trial court's order adjudicating some (but not all) claims remains

---

[3] A brief review of how the word "action" historically has been used supports the proposition that "action" means "cause of action" and not the entire lawsuit. Ohio's 1853 Code of Civil Procedure, like R.C. 2505.02(B)(1) today, defined "final order" to include "[a]n order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment." *See Code of Civil Procedure of the State of Ohio*, Section 512 (George E. Seney, Ed. 1860), available at https://heinonline.org/HOL/P?h=hein.sstatutes/coivpsoh0001&i=1. Other provisions in that same code demonstrate that, at that time, an "action" referred not to an entire petition or lawsuit and all claims therein, but to what we today would call a particular "claim for relief." Hence, the analogue to the modern rule governing "joinder of claims and remedies," was then entitled "Joinder of Actions," and employed the words "cause," "action," and "cause of action" interchangeably. *Compare id.* at Title VI, with Civ.R. 18. This further tracks contemporary legal parlance, which, as the code demonstrates, often referred to "[a]n action for trespass," "[a]n action for libel," or "[a]n action upon a contract." *See Code of Civil Procedure* at Sections 13-18.

presumptively "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Civ.R. 54(B); *see also Jarrett v. Dayton Osteopathic Hosp., Inc.*, 20 Ohio St.3d 77, 78 (1985) (because order "did not adjudicate the liabilities of all the parties" and was not certified under Civ.R. 54(B), "it was subject to modification").

**{¶30}** It is thus Civ.R. 54(B)'s presumption of mutability, and not R.C. 2505.02's final-order rule, that prevents piecemeal appeals on a claim-by-claim basis. Because the trial court remains free to change its mind about such an interlocutory order, it does not "prevent[] a judgment" in the losing party's favor under R.C. 2505.02(B)(1). *See Fuller v. Quality Casing Co., Inc.*, 2025Ohio361, ¶ 8 (1st Dist.); *Noble*, 44 Ohio St.3d at 97, fn. 6.

**{¶31}** However, a trial court can "rebut this presumption of mutability" and enter final judgment as to particular claims, if it certifies under Civ.R. 54(B) that it finds "no just reason for delay." *Fuller* at ¶ 9; *see Ames v. Rootstown Twp. Bd. of Trustees*, 2022-Ohio-4605, ¶ 15, fn. 1 (Civ.R. 54(B) "certification made the trial court's order final, and therefore appealable, with respect to the claims it did dispose of"). Such a Civ.R. 54(B) certification severs the resolved claims from the remaining, unresolved ones, and bundles the former together into a final judgment. Thus, the Ohio Rules of Civil Procedure, which permit the liberal joinder of claims and parties on the front end, also provide trial courts with a limited tool to sever them on the back end. *See Alexander*, 49 Ohio St.2d at 159-160 ("[q]uestions involving the joinder and separation of claims and the timing of appeals are matters of practice and procedure within the rule-making authority of" the Ohio Supreme Court).

**{¶32}** When a court properly certifies an order under Civ.R. 54(B), it "enter[s] final judgment" on the resolved and severed claims. That judgment, like all valid final

judgments, is a final, appealable order under R.C. 2505.02(B)(1) and 2501.02(C). *See Ames* at ¶ 15, fn. 1; *Whitaker-Merrell v. Geupel Co.*, 29 Ohio St.2d 184, 187 (1972) (judgment certified under Civ.R. 54(B) is reviewable both "upon the determination of no reason for delay, as well as for error in the granting of judgment").

**{¶33}** But certification under Civ.R. 54(B) must be *proper*. The Ohio Rules of Civil Procedure cannot "enlarge the statutory right of appeal." *See State v. Hughes*, 41 Ohio St.2d 208 (1975), syllabus. Thus, for an order to be properly certified under Civ.R. 54(B), it must be one that *would have been* an appealable "judgment[] or final order[]" pursuant to R.C. 2501.02(C) and Ohio Const., art. IV, § 3(B)(2), in the absence of the presumption of revisability created by Civ.R. 54(B). *See also Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 44 Ohio St.3d 17, 21 (1989) ("Civ. R. 54(B) . . . cannot affect the finality of an order."). Civ.R. 54(B)'s requirement that the trial court resolve "one or more . . . claims" has therefore been construed to require the *complete* resolution of one or more discrete causes of action. *See, e.g., Noble*, 44 Ohio St.3d at 95. Hence, a trial court cannot certify as final under Civ.R. 54(B) an order that adjudicates liability, but not damages. *See, e.g., Fireman's Fund Ins. Cos. v. BPS Co.*, 4 Ohio App.3d 3 (10th Dist. 1982); *State ex rel. White v. Cuyahoga Metro. Hous. Auth.*, 1997-Ohio-366, ¶ 12.

**{¶34}** In this case, the trial court's order plainly resolved both Appellants' second cause of action and Appellees' counterclaim in their entirety. The order thus resolved one or more discrete claims in their entirety, such that it could be certified under Civ.R. 54(B) as a final judgment on those claims.

**{¶35}** Further, the trial court did not abuse its discretion in using Civ.R. 54(B) to sever the resolved claims and certify its order. *See, e.g., Alexander*, 49 Ohio St.2d at 159 (reviewing Civ.R. 54(B) certification for an abuse of discretion); *Fuller*,

16

2025-Ohio-361, at ¶ 17 (1st Dist.). While the claims resolved by the judgment on appeal were not hermetically isolated from the claims outstanding below, the areas of overlap do not render the claims so "inextricably intertwined" as to prohibit the trial court from finding that there was "no just reason for delay." While our review of the trial court's determination as to the validity of the Association's Plan and subsequent actions may affect Appellants' outstanding claims for breach of fiduciary duty, intentional infliction of emotional distress, and civil conspiracy, we would not be compelled to be the first to weigh in on unresolved issues pending below. *Compare Fuller* at ¶ 14, 23-24, 28.

{¶36} Nor can we say that the overlap between the resolved and unresolved claims was otherwise so great as to render Civ.R. 54(B) certification an abuse of discretion. The claims resolved in the trial court's order were relatively self-contained, and further delay risked incurring further expenses and leaving the HNC in continued need of repair. With no preliminary injunction in place, the trial court wished to put its permanent injunction into effect, so it rendered its order final and appealable under Civ.R. 54(B).

{¶37} The trial court's order disposed of complete claims for relief, and the court did not abuse its discretion in certifying that order under Civ.R. 54(B). The order before us is therefore a "final judgment" under Civ.R. 54 and a "final order" under 2505.02(B)(1), and we have jurisdiction to hear this appeal under R.C. 2501.02(C).

### III. RIGHT TO JURY TRIAL

{¶38} Appellants' first assignment of error contends that the trial court, by proceeding with the limited bench trial below, denied Appellants their right to a jury trial. Specifically, Appellants contend that the right to a jury trial, as enshrined in "the Ohio and Federal Constitutions and Civil Rules," required the trial court to try their

"breach of contract" claim for damages to a jury *before* trying the related requests for a permanent injunction to the bench. Appellants further contend that a trial court has no discretion to bifurcate a trial in a manner that infringes that right. To resolve Appellants' first assignment of error, therefore, we must determine (A) whether Appellants would have a right to a jury trial on any of the issues underlying the claims adjudicated by the trial court, and (B) if so, whether the trial court's entry of judgment following the bench trial abridged that jury-trial right.

**A.**

{¶39} Our first question—whether Appellants were entitled to a jury trial on any of their claims—is a question of law, which we review de novo. *See Demery v. Baluk*, 2012-Ohio-4486, ¶ 21 (6th Dist.).

1.

{¶40} As a preliminary matter, we note that Appellants' first issue presented for review asserts a right to a jury under the United States Constitution. But the Seventh Amendment, which enshrines the federal right to a jury trial in civil cases, does not apply to suits brought in state courts. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 719 (1999) (describing it as "settled law that the Seventh Amendment does not apply" to "suits brought in state court"); *Arrington v. DaimlerChrysler Corp.*, 2006-Ohio-3257, ¶ 22, fn. 3 ("The federal constitutional right to trial by jury is inapplicable to state-law claims in a state adjudicatory regime.").

{¶41} Appellants also invoke the protections of the Ohio Constitution and the Ohio Rules of Civil Procedure, both of which do apply in Ohio courts. Similar to its federal counterpart, the Ohio Constitution guarantees that "[t]he right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

18

Ohio Const., art. I, § 5. The Ohio Rules of Civil Procedure likewise guarantee that "[t]he right to trial by jury shall be preserved to the parties inviolate" and prescribe how the right may be invoked or waived. Civ.R. 38(A)-(D). The rules provide that once a party makes a proper jury demand, the "trial of all issues so demanded shall be by jury, unless" the parties stipulate otherwise, or the court "finds that a right of trial by jury of some or all of those issues does not exist." Civ.R. 39(A).

{¶42} Because Appellants properly made a general jury demand, the trial court could only try the relevant issues to the bench if it found "that a right of trial by jury does not exist" on any of the "issues" to be tried. In civil cases, a right of trial by jury exists and must be preserved "only when, under the principles of the common law, the type of claim existed prior to the adoption of the Ohio Constitution." *McClain v. State*, 2022-Ohio-4722, ¶ 7, citing *Belding v. State ex rel. Heifner*, 121 Ohio St. 393, 396 (1929).

{¶43} As we explain in detail below, what Appellants have styled as a breach-of-contract claim is, in truth, an action for breach of the condominium's governing documents under R.C. 5311.19(A). But the fact that a statute *today* authorizes the action is not determinative. The Ohio Supreme Court, in both *Belding* and *McClain*, has focused the inquiry on whether the type of claim codified is "sufficiently similar to any cause of action recognized at common law." *See McClain* at ¶ 16; *see also Belding* at 396-397.

{¶44} *McClain* provides a roadmap for how to identify whether a statutory cause of action has a sufficiently similar common-law analogue to warrant a jury trial. The plaintiff in *McClain* had brought an action in the court of common pleas seeking a declaration of wrongful imprisonment under Ohio's wrongful-imprisonment statute, so that he could then seek damages in the court of claims. The plaintiff analogized his

action under the statute to a common-law action for false imprisonment. *McClain* at ¶ 10. Despite some similarities, the Ohio Supreme Court concluded that the new statutory claim was not the same type of claim as a common-law claim for false imprisonment. *Id.* at ¶ 17 (holding that Ohio's constitution "does not preserve a right to a jury trial in a wrongful-imprisonment action against the state, because the action did not exist at common law"). The *McClain* Court's considerations in reaching this conclusion can be bundled into three categories.

{¶45} *First*, the Court looked to the elements of and parties to the two actions. The wrongful-imprisonment statute created a right of action for "innocent persons who have been wrongfully convicted and incarcerated for a felony" to seek compensation from the State. (Cleaned up.) *McClain*, 2022-Ohio-4722, at ¶ 13, 14. By contrast, a plaintiff could bring a common-law false-imprisonment claim only against individual officials (or private persons), who had detained them without legal privilege to do so—regardless of the detainee's underlying innocence. *Id.* at ¶ 12-13.

{¶46} *Second*, the Court noted that the procedures required and method of providing relief under the wrongful-imprisonment statute were novel and had "'no parallel in the ancient dual system of law and equity.'" *Id.* at ¶ 15, quoting *Walden v. State*, 47 Ohio St.3d 47, 53 (1989). The Court noted that, in a prior case, it had held that a statutory wrongful-imprisonment action was a "special proceeding," rather than an ordinary "action." *Id.* at ¶ 16, citing *State ex rel. O'Malley v. Russo*, 2019-Ohio-1698, ¶ 21.

{¶47} *Third,* the Court noted that the statutory wrongful-imprisonment claim "supplement[ed]," rather than displaced, "the false-imprisonment tort," thus enabling "recovery in cases when recovery was not available" at common law. *Id.* at ¶ 16. The statute therefore "created a new right without a common-law analogue." *Id.*

**{¶48}** Similar considerations motivated the Court, in *Arrington v. DaimlerChrysler Corp.*, to hold that the Ohio Constitution did not require juries in workers' compensation appeals, because those proceedings "clearly differ[ed] from a common-law tort in significant ways." *Arrington*, 2006-Ohio-3257, at ¶ 25. The workers' compensation regime had been created to fill the "void of common-law remedies for workers injured on the job," resulting from the limited duty imposed upon employers in negligence actions and the availability of common-law defenses. *Id.* at ¶ 24, 16. To fill this void, the legislature had replaced ordinary negligence claims against employers with a novel procedure modeled on principles of insurance, rather than of tort. *Id.* at ¶ 24. These novel claims, which did not require the findings of culpability so central to tort actions, were not familiar to the common law, and therefore carried no constitutional right to a jury. *Id.* at ¶ 27.

**{¶49}** Beyond such analogic inquiries, Ohio courts have also held that a plaintiff is not entitled to a jury on claims seeking only equitable relief. *See State ex rel. Dann v. Meadowlake Corp.*, 2007-Ohio-6798, ¶ 44 (5th Dist.), citing *State ex rel. Miller v. Anthony*, 1995-Ohio-39, ¶ 14 ("In an action seeking an injunction, there is no right to a jury trial because such an action is equitable in nature."). Because "some causes of action sound in both law and equity," factually identical claims may sometimes be equitable or legal depending on the nature of the remedy sought. *See SEC v. Jarkesy*, 603 U.S. 109, 123 (2024) (discussing issue in Seventh Amendment context). This is why factual issues in a complaint seeking only specific performance of a contract are "triable to the court, and not, of right, to a jury," while claims for breach-of-contract damages—which sounded in assumpsit, debt, or covenant at common law—*are* triable to a jury. *See Hull v. Bell*, 54 Ohio St. 228, 239 (1896).

2.

**{¶50}** In this case, the trial court entered judgment in favor of Appellees on their first counterclaim, which sought an injunction, and against Appellants on their second cause of action, which sought both damages and injunctive relief. Because injunctive relief is fundamentally equitable, neither party had a right to a jury trial on Appellees' counterclaim or on the equitable issues going only to Appellants' request for an injunction. We therefore turn to Appellants' claim for damages under their second cause of action.

**{¶51}** Appellants styled their second cause of action as one for "breach of contract and bad faith." Strictly speaking, however, an action for the breach of a condominium's governing documents is not a common-law action in contract. Rather, it is a statutory action under R.C. 5311.19(A), which provides as follows:

> All unit owners, their tenants, all persons lawfully in possession and control of any part of a condominium property, and the unit owners association of a condominium property shall comply with all covenants, conditions, and restrictions set forth in a deed to which they are subject or in the declaration, the bylaws, or the rules of the unit owners association, as lawfully amended. Violations of those covenants, conditions, or restrictions shall be grounds for the unit owners association or any unit owner to commence a civil action for damages, injunctive relief, or both, and an award of court costs and reasonable attorney's fees in both types of action.

The statute does not specifically provide *either* for trial by jury *or* trial to the bench. Thus, we determine the parties' entitlement to a jury by asking whether the parties'

22

statutory claims are "sufficiently similar to any cause of action recognized at common law." *McClain*, 2022-Ohio-4722, at ¶ 16.

{¶52} While the breach-of-contract analogy suggested by Appellants provides us with a starting point, it quickly raises questions. In other contexts, this and other courts have analogized a condominium's governing documents—which the statute includes under the umbrella of "covenants, conditions, and restrictions" ("CCRs")—to a contract between unit owners. *See*, *e.g.*, *Behm v. Victory Lane Unit Owners' Assn.*, 133 Ohio App.3d 484, 487 (1st Dist. 1999) (referring to rights and duties under CCRs as imposed "by contract"); *State ex rel. Curd v. Blackhaus*, 56 Ohio App.2d 79, 81 (8th Dist. 1977) (CCRs "represent agreements among the unit owners themselves and between the unit owners and the association," and are therefore "essentially contractual" in nature). However, unlike regular contracts, the rights and duties incurred under CCRs run with the property, regardless of who owns it. *See* R.C. 5311.01 (defining "'Unit owner'" to mean one who "owns a condominium ownership interest in a unit"); R.C. 5311.19(A) (requiring "[a]ll unit owners" to "comply with all covenants, conditions, and restrictions"); R.C. 5311.19(B)(1) (permitting evictions for CCR violations). In this sense, they differ from the typical contract, which binds only parties and their privies.

{¶53} The common law did recognize a particular *type* of contract whose rights and duties ran with the land: the real covenant. *See Jubilee Ltd. Partnership v. Hosp. Properties, Inc.*, 2010-Ohio-5550, ¶ 30 (10th Dist.) ("Because, however, a real covenant runs with the land and 'passes to the assignee of the land,' no assignment of the promise, or consent to such assignment, is required: the promise passes automatically to the one who takes the land."); *see also* 2 Bouvier, *Institutes of*

*American Law*, § 2045, at 403-404 (1845)[4] (noting that certain affirmative covenants in deeds were "in the nature of real covenants running with the land conveyed; they descend to heirs and vest in assignees or the purchaser").

**{¶54}** Because real covenants would encumber all future owners' use of the property, common-law courts imposed strict requirements to determine when a covenant would run with the land and thus be enforceable against subsequent purchasers. *See* 7 *Thompson on Real Property, Thomas Editions*, § 61.03(b) (3d Ed. 2021) (hereinafter "Thompson"). In general, a promise in a deed was held to be a "real covenant" running with the land if (1) the parties to the initial agreement intended for the covenant to run with the land, (2) the agreement "touch[es] and concern[s]" the land, and (3) there is "privity of estate between the party claiming the benefit of the covenant and the party called upon to fulfill it." 35 Ohio Jur.3d, Deeds, § 96 (2024); *accord BM-Clarence Cardwell, Inc. v. Cocca Dev., Ltd.*, 2016-Ohio-7751, ¶ 37 (5th Dist.). *See also Huston v. Cincinnati & Z. R. Co.*, 21 Ohio St. 235, 247 (1871) (holding that agreement to build and maintain structures on property ran with the land, based on the "nature of the agreement, its qualification of the estate granted, its connection with the proceeding by which the title was acquired, and the fact that the agreement was to be of perpetual obligation"). The "privity" element required a showing of "both horizontal and vertical privity." 35 Ohio Jur.3d, Deeds, § 99 (2024); *accord BM-Clarence Cardwell* at ¶ 41.

**{¶55}** Real covenants were originally creations of the common law, not equity, and plaintiffs at common law could therefore bring actions in covenant for damages resulting from their breach. *See* 7 Thompson, § 61.05(a) ("money damages are the

---

[4] Volume 2 available at https://archive.org/details/cu31924018830541/page/402.

primary redress for violation of a real covenant"); 3 Bouvier, § 3452, at 623[5] (describing several covenants running with the land enforceable in covenant). Numerous authorities note the availability of *both* actions at law *and* suits in equity to enforce real covenants. *See Hysinger v. Mullinax,* 204 Tenn. 181, 187-188 (Tenn. 1958) (collecting authorities indicating the availability of a remedy at law for a breach of covenant running with the land); *see also* 3 Pomeroy, *Equity Jurisprudence*, § 1295, fn. 1, at 314-315 (A.L. Bancroft & Co. 1883)[6] (assuming that real covenants were ordinarily enforceable at law, before describing how, even when defective, they could nevertheless be enforced in equity).

{¶56} In 1871, for example, the Ohio Supreme Court clearly permitted a plaintiff to sue in damages for the breach of a promise running with the land. *Huston*, 21 Ohio St. 235. In *Huston*, both plaintiff and defendant had purchased their abutting properties from prior owners. *Id.* at 239-240. Plaintiff alleged that defendant's predecessor in interest, upon obtaining a share of the property from plaintiff's predecessor in interest, had contracted with plaintiff's predecessor to build and maintain a fence along the property line. *Id.* at 236-237. No fence was ever built, and plaintiff sued defendant. *Id.* at 240. The Ohio Supreme Court held (1) that the agreement had been enforceable against the original parties, *id.* at 246, (2) that the agreement "was in the nature of a charge upon that land, subjecting it to a servitude in favor of the estate from which it was to be taken," so that it would "run with the land," *id.* at 246-247, and (3) that the defendant was liable to the plaintiff in damages for harms that had accrued since the defendant had taken possession, *id.* at 247-248. Though *Huston* did not use the word "covenant," it is nevertheless evidence that

---

[5] Volume 3 available at https://archive.org/details/cu31924018830558/page/623.
[6] Available at https://archive.org/details/cu31924018830525/page/314.

common-law courts—indeed, Ohio courts—enforced agreements running with the land with damages awards. *See* 35 Ohio Jur.3d, Deeds, § 152 (2024); *Patterson v. Pease*, 5 Ohio 190, 191 (1831) (holding that plaintiff could pursue claim for breach of a covenant of warranty in his deed "by action of covenant, sounding in damages").

3.

**{¶57}** While Ohio's condominium law imposes numerous regulatory requirements on how condominium associations may be created and governed, it does so essentially by building upon the law of real covenants.

**{¶58}** Condominium units are "real property for all purposes and [are] real estate within the meaning of all provisions of the Revised Code," so that a "unit owner is entitled to the exclusive ownership and possession of the unit." R.C. 5311.03(A), (B). A "condominium ownership interest" carries not only a fee simple (or 99-year renewable leasehold) in the condominium unit itself, but also an "undivided interest in the common elements appurtenant to" that unit. *Id.*; *accord* R.C. 5311.01(N) (defining "condominium ownership interest").

**{¶59}** The statutory procedure for creating condominium units tracks the essential elements for creating real covenants at common law. Like a real covenant, a condominium declaration restricts the rights of all future owners of a condominium unit from the moment the first buyer receives the burdened property from the original owner of the larger, undivided condominium property, *see* R.C. 5311.02, and only terminates with the formal consent of the current owners of the benefited properties, *see* R.C. 5311.17. The principle that a condominium declaration is enforceable upon initial division of the condominium property even tracks the common-law requirement that, for a real covenant to run with the land, the covenanting owners of the burdened and benefitted estates had to be in "horizontal privity." 35 Ohio Jur.3d,

26

Deeds, § 93 (2024). Put another way, the Condominium Act, just like the law of real covenants, requires that "the covenant was created as part of a conveyance of real property between creating parties." (Cleaned up.) *See BM-Clarenc Cardwell*, 2016-Ohio-7751, at ¶ 41 (5th Dist.).

**{¶60}** Ohio has created a scheme to impose upon each condominium unit CCRs enshrined in statutes, deeds, declarations, and by-laws. These obligations run with the unit they burden and inure to the benefit of all others. Although these statutory covenants are heavily regulated, they conform to the essential elements and principles of the common law of real covenants. A condominium declaration is thus "more than a mere contract"; "it assumes some of the attributes of a covenant running with the land, circumscribing the extent and limits of the enjoyment and use of real property." *Pepe v. Whispering Sands Condominium Assn.*, 351 So.2d 755, 757 (Fla.App. 1977). An action to enforce CCRs with damages under R.C. 5311.19 is therefore in the nature of a common-law action for breach of covenant.

4.

**{¶61}** The fact that Appellants' suit in this case is against the Association, rather than individual owners, does not remove its fundamentally common-law character.

**{¶62}** A unit owners association is a representative body that acts on behalf of the owners. Under Ohio law, a unit owners association is composed entirely of other unit owners, who hold their properties subject to the limitations imposed by the declarations and by-laws. *See* R.C. 5311.01(DD) and 5311.05(B)(7). The unit owners association acts through its board of directors, who are elected by unit owners and their spouses, and who are themselves unit owners, spouses of unit owners, or representatives of corporate unit owners. R.C. 5311.08(A)(1). Thus, the Association,

acting through its Board, represents the unit owners bound up in the web of reciprocal covenants that bind the properties.

**{¶63}** To simplify the manner in which unit owners can vindicate the rights and duties in their CCRs, Ohio law empowers unit owners associations to "sue or be sued as a separate legal entity" in "any action relating to the common elements or to any right, duty, or obligation possessed or imposed upon the unit owners association by statute or otherwise." R.C. 5311.20; *see also* R.C. 5311.19 (permitting "any unit owner" to bring suit for violations of the "covenants, conditions, or restrictions" by other "unit owners," as well as "the unit owners association"). The Condominium Act makes the representative relationship clear—empowering the Board to "defend . . . any civil . . . action . . . that involves two or more unit owners, impacts zoning, or otherwise relates to matters affecting the condominium property." R.C. 5311.081(B)(2).

**{¶64}** Similar owners associations were not unknown to the common law. Developers employed the common-law tool of real covenants to create private homeowners associations long before any state enacted statutory permission to do so. The first such association appeared in Boston in 1844, when the residents of Louisburg Square filed a recorded agreement establishing a "Committee of the Proprietors of Louisburg Square," making every owner a member, and binding them and their assigns to keep up the jointly-owned private park. *See* McKenzie, *Privatopia: Homeowner Associations and the Rise of Residential Private Government*, 34 (1994).

**{¶65}** While their use in the 19th century was sporadic, automatic-membership homeowners associations began to take off in the first few decades of the 20th century, while still creatures of common law and private contract. *See* Hyatt, *Common Interest Communities: Evolution And Reinvention*, 31 John Marshall L.Rev.

303, 318-319 (1998);[7] Monchow, *The Use of Deed Restrictions in Subdivision Development*, 69-71 (1928)[8] (discussing types of owners' associations created by private-law covenant); McKenzie at 39-40 (describing the early associations established by deeds in the subdivisions of J.C. Nichols). It was amidst this boom that courts began to weigh in expressly, blessing the use of covenants running with the land to govern such common-interest developments. McKenzie at 51-55. And, in 1938, the New York Court of Appeals' decision in *Neponsit Property Owners' Assn. v. Emigrant Indus. Savs. Bank*, 278 N.Y. 248 (1938), recognized the ability of a homeowners association to enforce a covenant to pay for the maintenance of common interests without statutory authorization.

{¶66} These common-law homeowners associations were the lineal forbears of the condominium association. Indeed, legislation was arguably necessary to create condominium property, *not* because the common law lacked the tools to permit governance by private owners associations, but because the common law resisted the division of a single fee into multiple fees on a floor-by-floor or unit-by-unit basis. *See* Bennett, *Condominium Homeownership in the United States: A Selected Bibliography of Legal Sources*, 103 Law Libr.J. 249, 263-264 (2011),[9] discussing Berger, *Condominium: Shelter on a Statutory Foundation*, 63 Columbia L.Rev. 63 (1963). Condominium statutes, like Ohio's Condominium Act, overcame this barrier by defining a new type of property interest. Because these new condominium ownership interests required a greater reliance on common elements and shared ownership, the condominium statutes also structured and regulated the covenants

---

[7] Available at https://repository.law.uic.edu/lawreview/vol31/iss2/2.
[8] Available at https://archive.org/details/useofdeedrestric00monc/page/68.
[9] Available at https://www.aallnet.org/wp-content/uploads/2018/01/Vol-103-Spring-2011-2011-16.pdf.

burdening those units—imposing shared duties and binding owners to compliance with rules fashioned by a delegated rulemaking body. This web of restrictions and obligations was built upon the common law of real covenants, as developed in early common-interest communities and homeowners associations.

5.

**{¶67}** An action against a condominium owners association for breach of its governing documents is in the nature of an action to enforce a real covenant and must be treated as such for purposes of the jury-trial right preserved in the Ohio Constitution. Unlike the novel statutory schemes at issue in both *Arrington* and *McClain*, the Condominium Act did not create a novel cause of action where the common law provided no remedy; it carved out and regulated a subset of common-law actions for breach of real covenants running with the land. Unlike the wrongful-imprisonment statute in *McClain*, the Condominium Act created no new rights or liabilities, as far as covenants were concerned. Once condominium units were deemed real property, the common law gave owners a right to enforce reciprocal agreements that ran with the various units. The Act simply regulated what those agreements would be and how precisely they could be made. And unlike the workers' compensation claim in *Arrington*, the Condominium Act's cause of action did not fundamentally alter the elements or character of the enforcement mechanism it replaced. Rather, the Act effectively captured and mirrored the evolving common law of real covenants, including the essential elements necessary for such covenants to run with the land.

**{¶68}** R.C. 5311.19(A) provides quintessentially common-law relief (damages) in a quintessentially common-law action (covenant). A unit owner's suit under R.C. 5311.19(A) seeks to remedy a breach of the CCRs governing a condominium property, and is therefore in the nature of a suit to enforce a real covenant running

with the land—or, in this case, running with the condominium unit. If that unit owner seeks damages to remedy the breach, then their action at common law would have been in covenant. Actions in covenant, like virtually all damages actions at common law, were triable to a jury, and our constitution preserves that right to a jury "inviolate." We therefore hold that Article I, Section 5, of the Ohio Constitution preserves a condominium unit owner's right to a jury trial in an action for damages under R.C. 5311.19(A). Because Appellants' damages claim under their second cause of action fits this bill, it carried a right to a jury trial.

**B.**

{¶69} Despite Appellants' right to a jury trial, the trial court entered judgment in favor of Appellees on Appellants' second cause of action in its entirety, including the damages claim.

{¶70} Appellees' brief offers two theories for why, even accepting that the damages claim carried a jury right, this decision was proper. They contend (1) that Appellants' damages claim was "incidental to" their injunctive claim, such that the injunctive claim could be tried first, and (2) that the trial court resolved Appellants' damages claim as a matter of law and so needed to make no factual findings.[10] We find neither argument persuasive.

---

[10] At oral argument, Appellees also suggested that the trial court could find facts in resolving the second cause of action because such findings were merely "preliminary" and would be non-preclusive in later litigation. To the extent this was an alternative justification for why the trial court's factual findings on the common factual issues did not affect Appellants' right to a jury on the damages claim, it was not argued as such in Appellees' brief. Rather, it was a focal point of oral argument. However, we need not address claims raised for the first time at argument, where such claims could have been raised in the briefs. *See Whispering Woods Communities v. Orwig*, 2022-Ohio-4426, ¶ 26 (6th Dist.), quoting *State v. Clay*, 2022-Ohio-2878, ¶ 18 (10th Dist.) ("[I]t is well-established law that an appellate court will generally not consider arguments raised for the first time at oral arguments when a party had an opportunity to raise the issue in its brief."). We therefore decline to address Appellees' preliminary-and-nonpreclusive argument.

1.

**{¶71}** Appellees' principle argument is that Appellants' damages claim was "dependent upon the outcome of the injunctive relief claims because [Appellants'] damages will presumably be measured by whether the Plan is fully implemented, and they ultimately have to vacate their units or not." Thus, Appellees contend, the trial court was not only permitted but *compelled* to resolve any factual issues necessary to the equitable claims before it reached the legal issue.

**{¶72}** We start from the baseline principle, long established in Ohio law, that when "a plaintiff unites in the same action causes for equitable relief, and an independent cause of action for the recovery of money," and when "issues of fact be joined" between those claims, "a jury may of right be demanded for their trial." *Rowland v. Entrekin*, 27 Ohio St. 47, 49-50 (1875). In other words, a party has a right to a jury on each *issue* of fact subsumed by a jury claim. *Compare* Civ.R. 39(A) (requiring jury trial "of all *issues* so demanded" unless the court "finds that a right of trial by jury of some or all of those *issues* does not exist" (Emphasis added.)).

**{¶73}** The same principle applies whether the trial court holds a single trial or separate trials. Civ.R. 42(B) permits the trial court to order the separate trial of "one or more separate issues, claims, cross-claims, counterclaims, or third-party claims," but only if doing so would "preserve any right to a jury trial" on any claims or issues to which such a right attached. However a trial is separated, the trial court must ensure that the factual issues underlying any jury claims are tried by a jury.

**{¶74}** However, as Appellees note, there is an exception to this general rule when a party would only "incidentally be entitled" to damages "as a result of his obtaining the equitable relief sought." *See Rowland* at paragraph two of the syllabus. If a party has no legal claim unless and until a court of equity first grants equitable

32

relief, then that party's equitable claim must necessarily be tried first. Because of this historical sequencing requirement, a modern court retains the authority to make factual determinations underlying antecedent equitable claims, without the aid of a jury, before proceeding to resolve any dependent *legal* claims. *See id.*

**{¶75}** The facts of *Rowland* clarify the scope of this incidental-relief exception. In *Rowland*, the plaintiff sought (1) reformation of a lease and (2) damages for breach of that reformed lease. *Rowland*, 27 Ohio St. at 49. The former was a suit in equity, the latter an action at law. This would ordinarily mean the plaintiff was entitled to a jury on any common factual issues. However, the *Rowland* plaintiff's "right to recover damages depended wholly on his first obtaining the equitable relief." *Id.* If a court of equity declined to reform the lease, then the lease would have been "defective[]," and no damages could have flowed from its breach. *Id.* Thus, the plaintiff had no right to seek a jury trial on any factual issue underlying the lease reformation—even if the content of the lease was an issue common to both claims—because the court was powerless to reach the legal claim until it had fully resolved the equitable one.

**{¶76}** The Tenth District applied this rule much more recently in a case that yielded the opposite result: *Sidenstricker v. Miller Pavement Maintenance, Inc.*, 2004-Ohio-4653 (10th Dist.). In *Sidenstricker*, the plaintiff brought (1) a claim seeking damages for wrongful termination in violation of public policy and (2) a claim seeking reinstatement and lost wages for retaliatory discharge under R.C. 4123.90. *Id.* at ¶ 2. The former cause of action, the court said, was legal and usually required a jury trial, while the latter, statutory claim was equitable in character and required no jury. *Id.* at ¶ 11. The two claims shared almost identical factual underpinnings. The *Sidenstricker* court held that the plaintiff was entitled to a jury on these shared issues, because his legal claim was "neither incidental to nor dependent upon first obtaining

33

equitable relief in the statutory claim." *Id.* at ¶ 12. The court reached this conclusion by applying a straightforward test: Could the plaintiff have chosen to pursue his legal claim and abandon his equitable claim? *Id.* The answer, the court said, was "yes." Because Sidenstricker could have elected to pursue his common-law claim "in addition to or in lieu of" his statutory claim, any shared factual issues were for the jury. *Id.* at ¶ 12, 14.

{¶77} The *Sidenstricker* court further held that the trial court had erred in trying the equitable claim first, because doing so "improperly precluded a jury from deciding whether plaintiff established" the factual elements of his legal claim. *Id.* at ¶ 15. In order to "preserve[] the right to a jury trial on issues where such a right exists," the jury was required to have first crack at all the factual questions necessary to resolve the claim for legal damages—and the trial court was required to "defer to, and [be] bound by, the findings of the jury on the common issues." *Id.* at ¶ 14.

{¶78} Likewise, in *Raskow v. Fortner*, 1998 Ohio App. LEXIS 1563 (9th Dist. Apr. 15, 1998), the Ninth District considered whether a trial court had erred by denying a jury trial to plaintiffs who sought (1) damages for flooding caused by a dam constructed by their neighbors, and (2) an injunction requiring those neighbors to remove the dam. *Id.* at *1-2. The former claim entitled the plaintiffs to a jury trial; the latter did not. The defendants in *Raskow* argued that the plaintiffs' request for damages was dependent upon their equitable claim because, "'[i]f damages were to be found, . . . the court could do so only by finding that [plaintiffs] were entitled to injunctive relief.'" *Id.* at *6. The court rejected this argument. The "plaintiffs' claim for damages was a separate cause of action from their claim for equitable relief," and the defendants had not shown that prior resolution of the equitable claim was necessary to resolve the claim for damages. *Id.* The court balked at the notion that "merely

joining a legal and equitable claim allows a trial court to declare that the complaint is 'primarily' for equitable relief, and deny a jury trial on that basis." *Id.* at \*6-7. If this were so, plaintiffs "would essentially be forced to plead only legal claims to ensure a jury trial and forgo equitable ones." *Id.* at \*7. The trial court had therefore erred "by deciding the equitable claim before presenting the legal claim to the jury," as the plaintiffs' claim for damages was not "incidental to the equitable relief they requested." *Id.*

**{¶79}** Both the *Sidenstriker* and *Raskow* courts accepted as persuasive authority decisions from the United States Supreme Court, which interpreted the Seventh Amendment to require that a jury take first crack at factual issues shared between legal and equitable claims. *See Sidenstriker*, 2004-Ohio-4653, at ¶ 13 (10th Dist.), citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990), *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962), and *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959); *see also Raskow* at \*7-8, citing *Lytle* at 550.

**{¶80}** Against these authorities, Appellees cite *Precision Strip Inc. v. Dircksen*, 2020-Ohio-6668 (3d Dist.). The trial court in *Dircksen* had tried the plaintiff's declaratory claims, which were equitable in character, to the bench, while reserving the defendants' damages counterclaims for a later jury trial. *Id.* at ¶ 32. The Third District held that the trial court had not violated the defendants' jury-trial right, because the equitable and damages claims "did not share commonality of issues." *Id.* at ¶ 45. Summarily dismissing the relevance of both *Sidenstricker* and *Raskow* and distinguishing *Beacon Theaters*, the court seemed to suggest that a trial court may try any equitable claim to the bench before it tries any remaining legal claims to the jury, so long as those equitable and legal claims share no "overlap in legal issues." *Id.* But discrete *legal* issues may rest upon similar *factual* questions. A rule that considers

35

only "overlap in legal issues" would allow trial courts to resolve certain issues of fact that would be dispositive of a plaintiff's legal claims without giving the jury first crack at those factual questions. Such a rule would undermine the precept that "a jury may be demanded for the[] trial" of multiple causes of action whenever "issues of fact be joined." *Rowland*, 27 Ohio St. at 49-50. Indeed, such a rule would be inconsistent with *Beacon Theatres* and its progeny interpreting the Seventh Amendment, which have uniformly held that, where an action in federal court involves both equitable and legal claims, and where underlying "factual issues" are "common" to both, "the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims." *See Dairy Queen* at 479; *see also Raskow* at *7, citing *Lytle* at 550, and *Beacon Theatres* at 510.

{¶81} Like the courts in *Rowland*, *Raskow*, and *Sidenstricker*, we hold that, where a plaintiff brings both claims to which a jury right attaches and claims to which it does not, and where those claims involve common factual issues, the plaintiff has a right to have those common issues tried to a jury in the first instance, unless they are truly "dependent" upon and "incidental" to the threshold resolution of the non-jury claims. Further, we adopt the straightforward test employed by the *Sidenstricker* court to determine when this incidental-relief exception applies and hold that, when a plaintiff could choose to pursue her jury-trial claims "in addition to or in lieu of pursuing" her non-jury-trial claims, then the latter are not incidental to the former, and the plaintiff is entitled to a jury on any shared issues of fact. *See Sidenstricker*, 2004-Ohio-4653, at ¶ 12 (10th Dist.).

{¶82} In this case, Appellants asserted that the Association and Board had breached the governing documents in creating and implementing the Plan and Policy. These breaches, Appellants alleged, caused them to suffer compensable injuries, for

which they sought damages. And allowing the breaches to continue, they alleged, would cause them further injury, for which they sought an injunction. Appellees claimed the opposite—that the Association and Board's actions were proper and that Appellants should be enjoined to comply. Questions about the meaning of the governing documents and whether they were breached were common to all claims.

**{¶83}** Appellants' operative complaint alleged that Appellants "have and will continue to suffer damage as a proximate result of the breaches by Defendant HNCA, and Plaintiffs are entitled to money damages as a result." In other words, Appellants alleged that Appellees had *already injured them* and would likely continue to do so. We don't know if Appellants could have proved up their claims of past harms, because *no one asked them to*. Prior to trial, no motion, proceeding, or order required either party to submit evidence. Nor were Appellants obliged to submit such evidence at the bench trial, given the trial court's repeated assurances that it would not resolve any monetary-damages claims.

**{¶84}** Appellants alleged that Appellees committed unlawful actions that had already injured them. Appellants could therefore have pursued their damages claims "in lieu of pursuing" their claim for injunctive relief. *See Sidenstricker*, 2004-Ohio-4653, at ¶ 12 (10th Dist.). We therefore hold that Appellants' damages claims were not purely "incidental" or "dependent upon" their injunctive claims.

2.

**{¶85}** Next, Appellees argue that the bench trial did not resolve any issues of fact, but only issues of law regarding the meaning of the governing documents. Such legal issues, Appellees point out, do not go to a jury. This theory suffers from three flaws.

**{¶86}** *First*, while the trial court asserted that it intended to resolve only

"issues of law," its final order clearly went further and resolved issues of fact common to both Appellants' legal and equitable claims. The trial court's order was captioned "Findings of Fact, Conclusions of Law, and Final Order" and contained numbered factual findings, many of which resolved open factual questions. For example, the trial court found that the fires "caused substantial damage to the common areas and individual units throughout the entire Building, including the dispersal of soot throughout the Building." Similarly, the trial court expressly found that the "Board proved the conditions of the entire building are an imminent risk of harm to owners, third parties, and public safety," and that "remediation and reconstruction require the removal of walls and ceilings in common areas and Units." But Appellants have always contested the extent of the damage and the risk that damage created for the other units. Among the allegations in Appellants' operative complaint were averments that the "South end of the building had little smoke damage" and that "[m]ost of the units in HNC were untouched by the Fire damage." Appellants likewise alleged that, "upon information and belief, there is no evidence, data, or conclusion . . . that remaining 'soot' poses a health hazard to every unit owner at HNC and requires the removal of every ceiling of every unit." Appellants' factual allegations on these issues were thus rejected without the aid of a jury.

{¶87} *Second*, we note that the trial court also appeared to take evidence at the bench trial about the meaning of the governing documents. "'Extrinsic evidence is admissible to ascertain'" a written document's meaning, but only when that meaning "'is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning.'" *See Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12, quoting *Graham v. Drydock Coal Co.*, 1996-Ohio-393, ¶ 11. Once a provision is found to be ambiguous and extrinsic evidence admitted as an

interpretive aide, the provision's meaning ceases to be a pure question of law and becomes a factual question for a jury regarding the parties' intent. *See id*. (holding that "[i]t is generally the role of the fact-finder to resolve any ambiguity" in a written agreement). To the extent the trial court relied upon extrinsic trial evidence to construe ambiguous terms in the governing documents, it addressed and resolved factual questions that should have been left to the jury.

{¶88} *Third*, even if the trial court had properly concluded that no disputes of material fact persisted and Appellees were entitled to judgment as a matter of law on Appellants' damages claim, the court should have resolved that claim (or at least the common issues of fact) *before* holding the bench trial. *See, e.g.*, Civ.R. 56. But because several common issues of fact remained live at the start of the injunction trial below, the court proceeded to take evidence on them and to resolve them in its judgment entry. We are therefore not confronted with a case like *Butler Cty. Joint Vocational School Dist. Bd. of Edn. v. Andrews*, 2007-Ohio-5896, ¶ 41-44 (12th Dist.), in which the trial court held a bench trial on non-jury claims, before disposing of the remaining jury claims based on *undisputed facts* and *purely legal issues*. Rather, in the instant case, the bench trial both involved and resolved still-disputed facts.

{¶89} The trial court's decision to rule on Appellants' claim for damages under their second cause of action therefore could not be justified on the grounds that its resolution turned only on questions of law.

## IV. CONCLUSION

{¶90} Appellants were entitled to a jury on their claim for damages under their second cause of action. This damages claim was not "dependent" upon Appellants' claim for injunctive relief, but the two shared common factual issues that remained in dispute on the eve of trial. By nevertheless trying all injunctive claims to the bench,

and by resolving Appellants' damages claim following the bench trial, the trial court denied Appellants their right to have a jury resolve those common factual questions under the Ohio Constitution.

**{¶91}** We sustain Appellants' first assignment of error, reverse the trial court's judgment, and remand the cause for further proceedings consistent with the law and this opinion. Because such a disposition renders Appellants' second assignment of error moot, we do not address it.

Judgment reversed and cause remanded.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.